762 F.2d 1014
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
CLARENCE WINN, PLAINTIFF-APPELLANT,
v.
SMITH'S TRANSFER CORPORATION, INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, LOCAL UNION 651, DEFENDANTS-APPELLEES.
 NO. 84-5194
 United States Court of Appeals, Sixth Circuit.
 4/12/85
 
 ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY
 Before: MERRITT and WELLFORD, Circuit Judges; and, GILMORE*, District Judge.
 PER CURIAM.
 
 
 1
 Plaintiff, Clarence Winn, filed a complaint on September 14, 1981, which alleged that appellee Smith's Transfer Corporation (the 'Company'), which is a freight trucking firm, discriminated against plaintiff in violation of Title VII and of Sec. 1981, by wrongfully discharging him because of his race from employment at the Company's Lexington, Kentucky terminal on February 19, 1980. The complaint also alleged that appellee International Brotherhood of Teamsters, Local Union No. 651 (the 'Union') failed to process plaintiff's grievances and to fairly represent him because of his race, in violation of Title VII, Sec. 1981 and Sec. 301 of the Labor Management Relations Act, 29 U.S.C. Sec. 185. The district court found that plaintiff failed to make out a prima facie case of discrimination, and found that even if he had, the Company articulated legitimate non-pretextual reasons for discharging plaintiff. The court further found that the Union fairly represented plaintiff in his grievance proceedings.
 
 
 2
 This court is bound by the clearly erroneous standard when reviewing a district court's findings of lack of intentional race discrimination. Pullman-Standard v. Swint, 456 U.S. 273 (1982); Fields v. Bolger, 723 F.2d 1216, 1219 (6th Cir. 1984); Sones-Morgan v. Hertz Corporation, 725 F.2d 1071 (6th Cir. 1984). Because we find substantial evidentiary support in the record for each of the district court's findings, we AFFIRM the decision below in its entirety.
 
 
 3
 Briefly summarized, the record indicates the following evidence, credited by the trial judge as the trier of facts. The Company hired plaintiff as a driver/dock worker in October 1974. In February 1978, the Company, in hopes of improving discipline at the terminal, made Art Potter the terminal manager. In fact, subsequent to plaintiff's hiring and prior to Potter's assignment, the Company issued only seven warning letters, with plaintiff receiving one of them for failing to obey a supervisor's instructions. During Potter's tenure, however, the Com any issued fifty warning letters; plaintiff received six of these.[1]
 
 
 4
 Plaintiff claims that his Discharge #1 was partially a result of his efforts during the fall of 1978 to help another black driver, Amos Carter, secure permanent employment with the Company. Potter and Clifford Deringer, who was hired as terminal operations manager in January 1979, both testified that they did not learn of plaintiff's role in helping Carter obtain permanent employment until an argument plaintiff and Potter had on November 27, 1979. Before the November argument, however, plaintiff received two warning letters from Potter. The first was issued on November 3, 1978, which plaintiff received for leaving freight for which he had signed at Richmond Electric. The second was issued on July 2, 1979, which plaintiff received for leaving freight for which he had signed at Rand McNally.[2] Plaintiff also received a warning letter for directing abusive language at Potter during the November argument and received another warning letter the day after the argument for failing to tally freight properly.
 
 
 5
 On February 14, 1980, plaintiff refused to meet Potter in his office to discusss a customer's complaint,[3] demanding instead to talk to him in the drivers' room, apparently in the presence of other drivers. Plaintiff received a warning for failing to follow instructions because of his refusal to speak to Potter in Potter's office. The next day, plaintiff again refused to report to Potter's office. Plaintiff received another warning letter and was suspended for one day, February 18, because of this refusal.
 
 
 6
 On February 19, plaintiff agreed to come into Potter's office, but arrived with a portable tape recorder, which he demanded be on throughout the conversation. Potter instructed him to turn it off, which plaintiff refused. Potter then discharged plaintiff (Discharge #1) for his failure to follow instructions. Plaintiff, who was represented by the Union, successfully grieved this discharge and received a reduced sanction with reinstatement on March 17, not including any backpay.
 
 
 7
 Plaintiff received his next warning letter on January 28, 1981, this time for abuse of equipment.[4] Every driver who testified stated that they would not have done what plaintiff did, and would thereby have avoided causing damage to the equipment.
 
 
 8
 On May 7, 1982, plaintiff was on an 8:00 am.m to 4:30 p.m. workshift. He dispatched at 8:00 a.m. to deliver a load of cocoa. He arrived at the warehouse and began unloading the truck at 9:10 a.m. The warehouse was closed from 12:00 Noon until 1:00 p.m. for lunch. Plaintiff was expected to take his lunch during this break. Plaintiff did not take lunch at this time nor did he continue to unload the truck.
 
 
 9
 At his grievance hearing, plaintiff claimed that he did not take his lunch break because he was too dirty from the cocoa dust. At trial, on the other hand, he claimed that he stayed with his truck because (1) the distance to the nearest restaurant was too far to walk,[5] (2) he was worried about the security of his equipment, and (3) had he unhooked his tractor from the trailer he thought the trailer would nosedive.[6] When asked at trial why he did not give these three reasons for his failure to go to lunch, he merely claimed that he failed to give a complete statement. Plaintiff was not discharged because of his failure to take a lunch break. Rather, it was his subsequent actions and his claiming overtime pay on that occasion that led to his discharge.
 
 
 10
 Plaintiff signed out from the warehouse at 4:35 p.m. without following established procedure of notifying the Company that he was finished with the delivery. Instead, he went home to change clothes and clean up. At 5:10 p.m. plaintiff signaled that he was done with his assignment. Because of his actions plaintiff was able to claim additional overtime to which he was not entitled. Had his story been completely true and accepted plaintiff might have been eligible to receive compensation for this claimed time but at regular, not overtime, rates. In any event, when confronted, plaintiff admitted the true situation; when asked to justify his actions he stated he was not going to drive home covered with cocoa dust and would do the same thing again. Plaintiff did not justify his actions with the three rationalizations he offered at trial, and the Company offered facilities at work for an employee to wash. Plaintiff subsequently was discharged (Discharge #2) for claiming overtime falsely. He grieved this discharge; was represented by defendant union, but lost.
 
 
 11
 Plaintiff's unfair representation claim rests solely on the Union's success in getting one Richard Snow, a caucasian, reinstated by his employer, McLean Trucking, after he had over-extended his lunch break. Snow, unlike plaintiff, admitted his error at the outset, did not claim any right to the time, and pleaded for mercy. Snow was reinstated without backpay.
 
 
 12
 The district court made the following essential findings:
 
 
 13
 1. Arthur Potter was assigned to the terminal where plaintiff worked to re-establish discipline and proper procedures, and, in fact, attempted to follow the Company's policy of increased discipline.
 
 
 14
 2. Neither Potter nor Derringer were aware of plaintiff's attempt to help Amos Carter procure permanent employment until November 27, 1979, therefore disciplinary matters prior to that date could not have been retaliatory.
 
 
 15
 3. White and black drivers were subjected to equally strict discipline both before and after Potter's arrival at the terminal.
 
 
 16
 4. Potter issued a warning letter for abusive language following the November 27, 1979, argument.
 
 
 17
 5. Potter issued warning letter, gave a one day suspension, and finally discharged plaintiff for his failure to follow instructions relating to discussions Potter wished to have regarding a customer's complaint.
 
 
 18
 6. Plaintiff was unsuccessful with his discrimination claims relating to this discharge, although following arbitration he was reinstated without backpay.
 
 
 19
 7. On May 7, 1982, plaintiff was dispatched to deliver a truckload of cocoa, the warehouse was closed from noon until 1:00 p.m., plaintiff did not take lunch or continue to unlod his truck during the break, but remained with his truck. Plaintiff gave three rationalizations for not taking lunch during the break.[7] Plaintiff signed out of the warehouse at 4:30 p.m., went home and changed, and at 5:10 p.m. signaled that he was ready for reassignment. He claimed one hour and five minutes of overtime.
 
 
 20
 8. Plaintiff was in contravention of Company policy for his actions on May 7, and the Company acted within its rights in discharging him.
 
 
 21
 9. Plaintiff failed to present credible evidence that the Union represented his grievance differently from comparably situated white drivers.
 
 
 22
 Our analysis of the record does not establish error in any of the district court's findings. Accordingly, we AFFIRM the judgment of the district court.
 
 
 
 *
 Honorable Horace W. Gilmore, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Plaintiff does not argue that his discipline improved, even though he received over 14% of the pre-Potter warnings, but only 12% of the post-Potter warnings
 
 
 [2]
 Plaintiff claimed that white drivers leaving freight at customer plants were not discharged. Willie Huls and Earl Loman testified that they had left freight at customers' plants but in each of those instances had been unable to locate the items and thus did not sign for them
 Potter testified to giving white drivers warning letters on at least five occasions for leaving freight for which they had signed. These letters were Company's exhibit Nos. 04-08. Plaintiff claims these letters are irrelevant because Nos. 7 and 8 were issued after plaintiff received his; plaintiff, however, does not make this claim for Nos. 4-6.
 
 
 [3]
 The customer complained in the fall of 1979 that plaintiff was interfering with his employees while making deliveries. Potter spoke to plaintiff about the problem and accepted plaintiff's explanation. In February 1980, after business from that customer continued its sharp decline, a Company sales representative informed Potter that the customer was still complaining about plaintiff's conduct
 
 
 [4]
 Plaintiff characterizes this letter as a warning for following instruction. A brief glance at the facts surrounding the incident, which caused about $5,000 damage to plaintiff's tractor, suffices to dispel any notion that plaintiff received the letter because he acted properly in the situation: plaintiff's tractor began to run in reverse and spew oil after the engine had been lugged to near stalling. This is not an uncommon occurrence, and as plaintiff well knew, the proper procedure was immediately to turn the engine off. Plaintiff, without turning off the straining engine, called the dispatcher, a woman with no truck driving experience, who instructed plaintiff to try to bring the tractor into the terminal. With the engine still running in reverse and spewing oil, plaintiff attempted to drive the truck. Consequently, the tractor caught fire
 
 
 [5]
 Other evidence indicated that there were numerous eating establishments in the nearby area, which were frequented by the Company's drivers
 
 
 [6]
 A number of drivers indicated that although a trailer can nosedive, it will do so only in unusual circumstances. They all testified that there was no risk of a nosedive given the way the cocoa had been loaded in plaintiff's truck
 
 
 [7]
 The court gave no indication concerning the validity of these rationalizations